UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-961(DSD/SRN)

Fox Sports Net Minnesota, LLC, a Delaware limited liability company,

Plaintiff,

v.

**ORDER**

Minnesota Twins Partnership, a Minnesota general partnership, and Kevin Cattoor, its Chief Operating Officer,

Defendants.

Barbara P. Berens, Esq., John D. Bessler, Esq. and Kelly & Berens, 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

Roger J. Magnuson, Esq., Peter W. Carter, Esq., Andre Hanson, Esq., and Dorsey & Whitney, 50 Sixth Street South, Suite 1500, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court upon defendants' motion for declaratory judgment on plaintiff's contract claims, upon defendants' motion for summary judgment on plaintiff's tort claims, and upon plaintiff's motion for partial summary judgment on the interpretation of the 1998 Telecast Agreement between the Minnesota Twins and CBS. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies in

FILED MAY 08 2002
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ____
Deputy Clerk's Initials ____

part and grants in part defendants' motion for declaratory judgment, continues defendants' motion for summary judgment until supplemental briefing is complete and grants plaintiff's motion for partial summary judgment on the interpretation of the 1998 Telecast Agreement.

## BACKGROUND

This dispute arises from a lawsuit brought by Fox Sports Net Minnesota, LLC, ("Fox") against Kevin Cattoor, the Chief Operating Officer of the Minnesota Twins, and the Minnesota Twins, (collectively "the Twins"). Fox alleges breach of contract and various tort claims. In this order, the court focuses on the dispute over the telecast rights under the 1998 Telecast Agreement. Fox alleges that, pursuant to a 1998 Telecast Agreement between the Minnesota Twins and CBS, it is entitled to telecast the Minnesota Twins baseball games for the option years set out in the contract, namely the 2002 and 2003 baseball seasons, while the Twins contend that Fox has no such right because the Twins did not secure an "acceptable stadium solution" by the end of the 2001 baseball season.

### I. 1998 Telecast Agreement

On January 23, 1998, the Minnesota Twins and CBS entered into a Telecast Agreement which provided that certain Minnesota Twins baseball games would be telecast on Midwest Sports Channel ("MSC").

(Cattoor Aff., Telecast Agreement, Ex. 1.) At the time, Cattoor was the general manager at MSC and was involved in the negotiations. (Cattoor Aff. at ¶ 2.) In February 2001, CBS sold MSC's assets, including its rights under the 1998 Telecast Agreement, to Fox. (Cattoor Aff, Ex. 2.) The Twins expressly consented to the assignment of the Telecast Agreement to Fox. (Id.) Fox now stands in the shoes of CBS for purposes of the rights at issue in this case.

Article IV and Article V are the critical provisions of the Telecast Agreement in this dispute. Article IV gives MSC, now Fox, the right to telecast a number of Twins baseball games beginning on January 1, 1998, and ending at the close of the 2001 baseball season. (Cattoor Aff, Ex. 1, Article IV.) Article IV also provides MSC/Fox with an option to extend the term of the Agreement to the 2002 and 2003 baseball seasons in specific circumstances. (Id.) MSC/Fox would have this option only if an "acceptable stadium solution" existed by the end of the 2001 baseball season.[1]

---

[1] Article IV specifically provides:

> This Agreement shall take effect and shall remain in full force and effect (unless otherwise terminated as permitted hereunder) for four (4) Baseball Seasons, commencing on January 1, 1998 and ending with the completion of the 2001 season (the "term"). If the Twins secure an acceptable stadium solution, excluding a new stadium, during the Term of this Agreement, CBS may extend, at its option, the Term of this Agreement for two (2) additional years through the 2003 Baseball

(continued...)

Section 5.1 of Article V sets forth a schedule of predetermined "annual license fees per Baseball Season." (Cattoor Aff., Ex. 1, Article V, Section 5.1.) Section 5.1 requires the payment of an additional 25 percent annual license fee if "the Twins secure an acceptable stadium solution or new stadium solution which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years...."[2] (Id.)

## II. The Metrodome

On July 31, 1998, the Minnesota Twins entered into a lease agreement with the Metropolitan Sports Facilities Commission ("the Commission") for use of the Metrodome. The term of the agreement ran through October 31, 2000, but provided the Minnesota Twins with the option to exercise three one-year extension periods:

---

[1](...continued) Season (the "Option Years"). (Cattoor Aff., Ex. 1, Article IV.)

[2] Article V, in relevant part, provides:

> During the Term of this [Telecast] Agreement, if by December 1, 1998, and each subsequent December 1, the Twins secure an acceptable stadium solution or new stadium solution which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years, the annual license fees stated above for each Baseball Season following the acceptable solution shall be increased by twenty-five percent (25%). If the stadium solution does not subsequently occur, the Twins agree to reimburse CBS for any overpayment of such annual license fees.(Cattoor Aff., Ex. 1, Article V, Section 5.1.)

> The Team shall have the option to extend the Term of this Agreement for three successive, but separate, one-year periods ending, respectively on October 31, 2001, 2002, and 2003 ... by serving notice of such extension on the Commission not later than October 1, 2000, 2001, or 2002 ("Option Dates"), as the case may be....

(Bessler Aff., Ex. 10 at ¶ 3.2.)

On September 27, 2000, the Minnesota Twins exercised the first of their options, i.e., to use the Metrodome for a one-year period ending October 31, 2001. (Bessler Aff., Ex. 11.) The Minnesota Twins again exercised their option to extend the agreement through the 2002 season. (Bessler Aff., Ex. 14.) The Minnesota Twins have not exercised the option for the 2003 baseball season and are not contractually obligated to play in the Metrodome through the 2003 season.

**III. Victory Sports**

Kevin Cattoor, the chief operating officer of the Minnesota Twins, is responsible for the creation and operation of Victory Sports. Victory Sports, owned by the owner of the Minnesota Twins, is a start-up regional sports network ("RSN") that packages and markets various sporting-event products for delivery via cable and satellite providers. Victory Sports intends to package and market Minnesota Twins games throughout the region once the rights of the Twins to telecast such games have been adjudicated and if an agreement is reached between the Minnesota Twins and Victory Sports. (Cattoor Aff. at ¶ 10-12.)

**IV. The Present Dispute**

Fox brought this lawsuit against the Twins, including Cattoor, alleging breach of the 1998 Telecast Agreement, and various tort claims. The Minnesota Twins now asks the court for declaratory judgment, declaring that no acceptable stadium solution existed under the 1998 Telecast Agreement and that the Minnesota Twins have not breached this contract. The Twins also seek summary judgment on Fox's tort claims. Fox asks the court to grant partial summary judgment declaring that Fox had an option to telecast the 2002 and 2003 baseball seasons, that the option matured upon the Twins' exercise in September 2000 of their one-year option to use the Metrodome for the year ending October 31, 2001, and that Fox properly provided written notice exercising the option to telecast by letter dated October 10, 2001. For the reasons stated, the court denies in part and grants in part defendants' motion for a declaratory judgment, continues defendants' motion for summary judgment on plaintiff's tort claims until supplemental briefing is complete and grants plaintiff's motion for partial summary judgment on its contract claims.

**DISCUSSION**

**I. Standard for Summary Judgment and Declaratory Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

The Declaratory Judgment Act, 28 U.S.C. § 2201, grants courts discretion to declare rights. Twin City Fed. Sav. & Loan Ass'n v. Gelhar, 525 F. Supp. 802, 804 (D. Minn. 1981). "An action for declaratory relief properly should be entertained where a judgment will serve a useful purpose in clarifying and settling legal relations, and where it will terminate the proceedings and afford relief from uncertainty, insecurity and controversy." Id.

**II. Contract Claims: 1998 Telecast Agreement**

Under Minnesota law, the construction and effect of a contract is a question of law, unless a contract's terms are ambiguous. Jacobs v. Pickands Mather & Co., 933 F.2d 652, 657 (8th Cir. 1991); Sorvais v. T.J. Mgmt. of Minneapolis, Inc., 973 F. Supp. 885, 892 (D. Minn. 1997). A contractual term is ambiguous if it is susceptible to more than one interpretation. Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). The court determines whether a contract is ambiguous as a matter of law. Boat Dealers' Alliance, Inc. v. Outboard Marine Corp., 182 F.3d 619, 621 (8th Cir. 1999). Summary judgment is appropriate when a contract is unambiguous. See Lehman Bros. Kuhn Loeb, Inc. v. Clark Oil and Refining Corp., 739 F.2d 1313, 1317 (8th Cir. 1984).

In construing a contract, the court must "give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." Art Goebel, Inc. v. North Suburban Agencies, 567 N.W.2d 511, 515 (Minn. 1997). To ascertain the

parties intentions, the court must interpret the contract as a whole and attempt to harmonize all the contract's terms. See, e.g., Jacobs, 933 F.2d at 657; Servais, 973 F. Supp. at 892; Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 525 (Minn. 1990); Brookfield, 584 N.W.2d at 394; SO Designs USA v. Rollerblade, Inc., 620 N.W.2d 48, 53 (Minn. Ct. App. 2000); Republic Nat'l Life Ins. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979). The court must give the language of the contract its plain and ordinary meaning. See, e.g., id.; Brookfield, 548 N.W.2d at 394; Servais, 973 F. Supp. at 892; SO Design USA, 620 N.W.2d at 52.

If the contract is unambiguous, the parties to the agreement are entitled to rely solely on the clear wording of their agreement to define their rights and responsibilities thereunder. See, e.g., Metropolitan Sports Comm'n v. General Mills, Inc., 470 N.W.2d 118, 123 (Minn. 1991)(stating that, where there is no ambiguity, the court must determine the parties' intentions from the language used); Farkas v. Hartford Accident & Indem. Co., 173 N.W.2d 21, 24 (Minn. 1969)(holding that "'[t]he contract rights of the parties must be determined from the language used in the contract where it is unambiguous....'")(quotation omitted). Under such circumstances, the rights and responsibilities of the parties are to be determined by examining the four corners of the relevant documents. See, e.g., MacKenzie v. Summit Nat'l Bank, 363 N.W.2d

116, 121 (Minn. Ct. App. 1985)(holding that "'[p]eople who sign documents which are plainly written must expect to be held liable thereon. Otherwise written documents would be entirely worthless and chaos would prevail in our business relations.'")(quoting Watkins Prods., Inc. v. Butterfield, 144 N.W.2d 56, 58 (Minn. 1966)).

**A. Fox's Option Rights**

Here, the court finds, and the parties agree, that the language of the 1998 Telecast Agreement is clear and unambiguous. (Mem. Law Opp'n to Def.'s Mot. Summ. J. at 9; Def.'s Mem. Supp. Mot. Summ. J. at 10.) It provides Fox with the right to telecast the Twins baseball games for the term of the agreement. (Bessler Aff., Ex. 1, Article IV.) Article IV defines the word "Term" to mean the four baseball seasons, beginning on January 1, 1998 and ending at the close of the 2001 baseball season. (Id.) Article IV also specifies the basis upon which CBS/Fox would obtain the right to telecast games in the option years:

> If the Twins secure an acceptable stadium solution, excluding a new stadium, during the Term of this Agreement, CBS may extend, at its option, the Term of this Agreement for two (2) additional years through the 2003 Baseball Season (the "Option Years").

(Id.) Fox therefore had an option to extend the term of the contract only if an "acceptable stadium solution" existed, excluding a new stadium, by the end of the 2001 baseball season.

**1. No New Stadium**

Because the Twins did not secure a new stadium by the end of the 1991 baseball season, this condition cannot defeat Fox's right to exercise its option for the 2002 and 2003 baseball seasons.

**2. Acceptable Stadium Solution**

The parties disagree over the definition of an "acceptable stadium solution" and dispute whether an "acceptable stadium solution" existed by the end of the 2001 baseball season. The Twins claim that Article V of the Telecast Agreement defines an "acceptable stadium solution" subjectively, as a solution "which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years." (Def. Mem. Supp. Mot. Summ. J. at 10, 13.) The Twins allege that they have not secured such a solution. Fox contends that an "acceptable stadium solution" must be defined objectively and that this standard has been satisfied. (Mem. Law Opp'n to Def.'s Mot. Summ. J. at 13.)

The court must determine as a matter of law whether an objective or subjective standard applies to the definition of "acceptable stadium solution." Greenwood v. Koven, 880 F. Supp. 186, 199 (S.D.N.Y. 1995). Acceptable means satisfactory. (Bessler Aff., Ex. 20-21.) In cases where the parties require satisfaction before a party's duty to perform is triggered, such as before option rights are triggered, "the great majority of the cases hold that an objective standard will be employed in the absence of an

absolute unequivocal requirement of subjective satisfaction with no alternative." Williston on Contracts § 38:22 (4th ed. 2000). Thus, where a contract is silent or ambiguous as to whether the objective or subjective standard is to apply, "the preference is for an objective standard which provides greater protection to the obligee." Greenwood, 880 F. Supp. at 199; Williston on Contracts § 38:22 (4th ed. 2000)("the preference of the law is for the more objective standard...."); see Restatement (Second) of Contracts § 228 (1981)(stating that objective standard is preferred "[w]hen it is a condition of an obligator's duty that he be satisfied with respect to the obligee's performance or with respect to something else...."); Farnsworth on Contracts, § 8.4 (1990)(suggesting preference of the objective standard).

Here, the court applies the objective standard of "acceptable" because the 1998 Telecast Agreement does not specify whether the term "acceptable stadium solution" requires an objective or subjective interpretation. Under the objective standard, the Twin demonstrated that the Metrodome was an "acceptable stadium solution" when, on September 27, 2000, the Twins exercised the first of their one-year options to use the Metrodome until October 31, 2001. Thus, the court finds that the Twins secured an "acceptable stadium solution" during the term of the Telecast Agreement.

The Twin's exercise of their one-year option to use the Metrodome for the year ending in October 31, 2001, triggered Fox's option rights under Article IV. The First Amendment to the Telecast Agreement requires Fox to exercise the option to telecast the 2002 and 2003 baseball seasons by giving the Twins written notice thereof "on or before November 1, 2001." (Bessler Aff., Ex. 12.) In a letter dated October 10, 2001, Fox notified the Twins that it was exercising the option to telecast the 2002 and 2003 baseball seasons. (Bessler Aff., Ex. 13 at ¶ 3.) Thus, Fox has properly exercised its option and is entitled to telecast Twins' games in the 2002 and 2003 baseball seasons pursuant to the clear terms of the Telecast Agreement.

The court is unpersuaded by the Twins' argument that Section 5.1 of the Telecast Agreement defines "acceptable stadium solution" as one that secures the Twins in the metro area through the 2003 baseball season. The plain language of Section 5.1 does not define "acceptable stadium solution." It merely states the conditions that trigger a 25 percent increase in the annual license fees:

> During the Term of this [Telecast] Agreement, if by December 1, 1998, and each subsequent December 1, the Twins secure an acceptable stadium solution or new stadium solution which secures the Twins in the Metro Area for the remaining Term of this Agreement, including the Option Years, the annual license fees stated above for each Baseball Season following the acceptable solution shall be increased by twenty-five percent (25%). If

> the stadium solution does not subsequently occur, the Twins agree to reimburse CBS for any overpayment of such annual license fees.

(Bessler Aff., Ex. 1, Article V, Section 5.1.)

Moreover, if the drafters of Section 5.1 had intended to define the term "acceptable stadium solution" to mean a solution that secures the Twins in the metro area for the term of the Agreement, including the option years, as the Twins assert, then a new stadium would satisfy this definition and Section 5.1 would have read "an acceptable stadium solution, including a new stadium,..." However, the language of Section 5.1 instead reads that either an "acceptable stadium solution or new stadium" can secure the Twins in the metro area for the remaining term, including the option years. (Bessler Aff., Ex. 1, Article V, Section 5.1 (emphasis added).) Thus, the Twins' definition fails based on the clear language of Article V.[3]

---

[3] Because the Telecast Agreement is unambiguous and fully integrated, the Twins cannot rely on extrinsic evidence to contradict the Agreement's clear terms. See, e.g., Norwest Bank Minnesota, N.A. v. Midwestern Machinery Co., 481 N.W.2d 875, 881 (Minn. Ct. App. 1992)("Where a written agreement is integrated, no prior oral agreement relating to that agreement may vary its terms."); Apple Valley Red-E-Mix, Inc. v. Mill-Winfield Eng'g Sales, Inc., 436 N.W.2d 121, 123 (Minn. Ct. App. 1989)("Pursuant to general contract law, the terms of a final and integrated written expression may not be contradicted by parol evidence of previous 'understandings and negotiations... for the purpose of varying or contradicting the writing'")(quoting 3A Corbin, Corbin on Contracts, § 573 (1960)). The Telecast Agreement contains an express integration clause, which provides:

> Section 12.2 Entire Agreement: This Agreement together with Exhibits attached hereto

(continued...)

The court also rejects the Twins' argument that Fox cannot secure its option rights because Fox did not pay additional license fees under Article V, Section 5.1 of the Telecast Agreement. The Twin's right to receive additional annual license fees is conditioned upon different circumstances than Fox's option rights. The right of the Twins to additional annual license fees is triggered upon the Twins securing an acceptable stadium solution or new stadium that keeps the Twins in the Metro area for the term of the Agreement, including the 2002 and 2003 baseball seasons. (Bessler Aff., Ex. 1 at V.) In contrast, Fox's options rights are triggered upon the Twins securing an "acceptable stadium solution," but not a new stadium, during term of the Agreement, ending in October 2001, not including the 2002 or 2003 baseball season. (Bessler Aff., Ex. 1, Article IV.) Thus, Fox obtained option rights without triggering the right of the Twins to receive additional annual license fees because the Twins achieved "an acceptable stadium solution" that did not secure the Twins in the

---

[3](...continued)

> constitutes the Entire Agreement between the parties hereto with respect to the transactions contemplated hereunder and supersedes all prior and contemporaneous agreements and understandings of the parties and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein. (Bessler Aff., Ex. 1, Article XII, Section 12.2.)

metro area for the 2003 baseball season.[4] Thus, the court denies in part defendants' motion for declaratory judgment declaring that an "acceptable stadium solution" did not exist under the Telecast Agreement and grants plaintiffs' motion for partial summary judgment on this issue.

**B. Fox's Additional Contract Claims**

In its complaint, Fox also alleges that the Twins breached the Telecast Agreement by failing to honor CBS's (now Fox's) right of first refusal to obtain certain telecast rights to games played by the Twins in subsequent seasons and by disclosing confidential information in violation of the confidentiality clause in the Supplement to the Telecast Agreement. (Compl. at ¶ 55.) The court examines each claim in turn and finds that the Twins did not breach either provision.

**1. Right of First Refusal**

The Twins did not fail to honor CBS's/Fox's right of first refusal. Section 13.01 of the Supplement to the Telecast Agreement provides:

> If the Twins receive a bona fide written offer from a third party for the Telecast rights subject to this Agreement to Games of the

---

[4] As discussed, the Twins have exercised only two of their three one-year options for use of the Metrodome. Consequently, the Twins have secured an "acceptable stadium solution" through the 2002 baseball season. The Twins, however, have not satisfied the condition that triggers their right to receive additional license fees because the Twins have not secured an "acceptable stadium solution" or a new stadium through the 2003 baseball season.

> Twins which will be played in Baseball Seasons subsequent to the 2001 Baseball Season (through the 2003 Baseball Season if the Option Year is exercised) which the Twins desire to accept, the Twins shall deliver a written notice (the "Offer") to CBS describing the terms and conditions of such third party offer. CBS shall have the right for twenty (20) days after receipt of the Offer to exercise a right of first refusal to enter into a contract with the Twins for such Telecast rights of substantially the same terms and conditions as are set forth in the Offer. (Cattoor Aff., Ex. 12, Article XIII, Section 13.01.)

Section 13.04 limits CBS's right of first refusal:

> Notwithstanding anything to the contrary which is contained in this Article XIII, CBS acknowledges that it shall not have a right of first refusal to acquire the Telecast rights to Games of the Team which will be played during the subject Baseball Seasons or thereafter if (1) the Twins decide to produce and sell all the advertising on the Telecasts of Games of the Twins by itself or through any entity or entities that are either controlled by, or the majority of the outstanding interests in which are owned by, the Twins, its owners and/or investors organized by its owners.... (Cattoor Aff., Ex. 12, Article XIII, Section 13.04.)

Here, the exclusion set out in Section 13.04 applies because Victory Sports is an affiliate of the Minnesota Twins that is owned by CRP Sports, Inc., which is owned by Carl Pohlad, the owner of the Twins. (Cattoor Aff. at ¶ 9.) Thus, even assuming that the Twins have negotiated a rights deal with Victory Sports, the Twins have not breached the right of first refusal.

### 2. Breach of Confidentiality

Moreover, the Twins did not breach the confidentiality clause in the Supplement to the Telecast Agreement by disclosing confidential information because, as the Twins point out, the confidentiality clause only applies to Fox. It provides:

> Section 13.06 Confidentiality. ***CBS*** agrees to use its best efforts to prevent any third party from learning of the right of first refusal which is described in Section 13.01.

(Cattoor Aff., Ex. 12, Supplement to Telecast Agreement, Article XIII, § 13.06 (emphasis added).) Fox does not dispute this assertion in its memorandum. Thus, the court concludes that the Twins cannot breach Section 13.06 because it does not apply to the Twins.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial summary judgment [Docket No. 25] is granted;

2. Defendants' motion for declaratory judgment [Docket No. 24] is granted in part and denied in part. Specifically, the court

   a. Denies defendants' request to declare that an "acceptable stadium solution" did not exist under the 1998 Telecast Agreement;

b. Grants defendants' request to declare that defendants did not breach plaintiff's right of first refusal; and

c. Grants defendants' request to declare that defendants did not breach the confidentiality clause in Section 13.06 of the Supplement to the Telecast Agreement.

3. Defendants' motion for summary judgment on plaintiff's tort claims [Docket No. 24] is continued until supplemental briefing is complete.

Dated: May 6, 2002

David S. Doty, Judge
United States District Court