UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-961(DSD/SRN)

Fox Sports Net Minnesota, LLC, a Delaware limited liability company,

Plaintiff,

v.

**ORDER**

Minnesota Twins Partnership, a Minnesota general partnership, and Kevin Cattoor, its Chief Operating Officer,

Defendants.

Barbara P. Berens, Esq., John D. Bessler, Esq. and Kelly & Berens, 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

Roger J. Magnuson, Esq., Peter W. Carter, Esq., Andre Hanson, Esq., and Dorsey & Whitney, 50 Sixth Street South, Suite 1500, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court on plaintiff's motion for summary judgment on defendants' counterclaims II-V and on defendants' motion for summary judgment on plaintiff's claims III-IV. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants both motions.

FILED 7-9-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 7-9-02
Deputy Clerk's Initials ______

**BACKGROUND**

On January 23, 1998, the Minnesota Twins and CBS entered into a Telecast Agreement which provided that certain Minnesota Twins baseball games would be telecast on Midwest Sports Channel ("MSC"). (Cattoor Aff., Ex. 1.) At the time, Kevin Cattoor was the general manager at MSC and was involved in the negotiations of that and other telecast rights contracts with various sports teams. (Cattoor Aff., ¶ 2; Bessler Supp. Aff., Ex. 1 (Cattoor Dep. at 11, 60).) Cattoor left MSC in March 2000. (Cattoor Aff. ¶¶ 2-3.) He had no non-compete agreement. (Id. ¶ 3.)

In January 2001, Cattoor became Chief Operating Officer ("COO") of the Minnesota Twins. (Id. ¶ 8.) As the COO for the Twins, Cattoor is responsible for the creation and operation of Victory Sports. Victory Sports, owned by the owner of the Minnesota Twins, is a start-up regional sports network ("RSN") that packages and markets various sporting event products for delivery via cable and satellite providers. Victory Sports had intentions to package and market Minnesota Twins games throughout the region. (Id. ¶¶ 10-12.) It is interested in other professional and amateur sporting events in the area as well, including the Minnesota Timberwolves basketball games and the University of Minnesota Gophers events. (Id. ¶¶ 11-12, 16.) The Minnesota Twins discussed the possibility of a joint-venture RSN with the Minnesota Timberwolves. (Id. ¶ 12.)

In February 2001, CBS sold MSC's assets, including its rights under the 1998 Telecast Agreement, to Fox. (Cattoor Aff., Ex. 2.). The Twins expressly consented to the assignment of the Telecast Agreement to Fox. (Id.) The Telecast Agreement provided MSC/Fox with an option to extend the term of the agreement to the 2002 and 2003 baseball seasons if an "acceptable stadium solution" existed at the end of the 2001 baseball season. The current litigation arose in part because the parties disputed whether such a solution existed. In a previous ruling, the court held that the Twins had secured an "acceptable stadium solution" and granted Fox's motion for partial summary judgment on Fox's breach of contract claim.

Now before the court are the Twins' motion for summary judgment on Fox's claims III-VII and Fox's motion for summary judgment on the Twins' counterclaims II-V. In particular, Fox alleges tortious interference with contracts and business relations, misappropriation of trade secrets, and breach of common law and fiduciary duties. The Twins' counterclaims allege business defamation, defamation, unfair competition, and tortious interference with prospective business relations. Based upon a review of the file, record and proceedings herein, the court grants both motions for summary judgment.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be

granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## II. Fox's Tort Claims

In its complaint, Fox alleges the following tort claims against the Twins: Count III, Breach of Duty of Good Faith and Fair Dealing (Twins); Count IV, Misappropriation of Trade Secret (Twins and Cattoor); Count V, Breach of Common Law and Fiduciary Duties (Cattoor); Count VI, Tortious Interference with Contract (Twins and Cattoor) and Count VII, Tortious Interference with Business Relations (Twins and Cattoor). The Twins move for summary judgment Fox's claims III-VII and the court grants the motion.[1]

### A. Misappropriation of Trade Secrets (Twins and Cattoor)

Fox claims misappropriation of trade secrets. In its complaint, Fox alleges:

> While serving as Vice President and General Manager of MSC, Cattoor had access to information about MSC's business, finances and contracts, including access to information about contracts with sports teams and collegiate athletic programs regarding

---

[1] In its memorandum opposing the Twins' motion for summary judgment on Fox's tort claims, Fox argues that, in the event that the court grants Fox's motion for partial summary judgment on the contract interpretation issues, the Twins' actions in breaching the contract also demonstrate the Twins' breach of the duty of good faith and fair dealing. (Mem. Law Opp'n Def.'s Mot. Summ. J. on Counts IV-VII at 1 n.1.) Fox, however, presents no evidence to support that contention. The court therefore grants the Twins' motion for summary judgment on Count III, Fox's claim of breach of duty of good faith and fair dealing.

> broadcast or television rights, including the specific terms of such contracts such as rights with respect to subsequent terms and the dates for termination or extension of telecast rights.

(Compl. ¶ 66.) The Twins respond that Fox presents insufficient evidence of misappropriation of trade secrets to withstand the Twins' motion for summary judgment.

The Minnesota Uniform Trade Secrets Act protects certain kinds of information through an action for misappropriation. Minn. Stat. §§ 325C.01-08. The Act defines misappropriation as improper acquisition, disclosure or use of a "trade secret." Minn. Stat. § 325C.01, Sub. 3. The Act defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> (i) derives independent economic value , actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. §325C.01, Subd. 5. The court analyzes three factors to determine whether a particular item constitutes a trade secret: (1) the information must not be generally known or readily ascertainable, (2) the information must derive independent economic value from secrecy and (3) the party asserting misappropriation must have made reasonable efforts to maintain the secrecy of the

item. Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999); Nordale, Inc. v. Samsco, 830 F. Supp. 1263, 1273 (D. Minn. 1993); Electro-Craft Corp v. Controlled Motion, Inc., 332 N.W.2d 890, 899-901 (Minn. 1983). The party asserting misappropriation must establish each factor to sustain its claim. Id. Here, Fox fails to present sufficient evidence of the existence of a trade secret or misappropriation to withstand the Twins' motion for summary judgment.

**1. Trade Secret**

Fox has failed to establish that specific information held by Cattoor constitutes a trade secret. See Int'l Bus. Mach. Corp. v. Seagate Tech., Inc., 941 F. Supp. 98 (D. Minn. 1992)(finding plaintiff failed to establish specific trade secrets). Fox suggests MSC's financial information is a trade secret. Mr. Thompson testified that the information was confidential. (Thompson Dep. at 104.) Cattoor treated the information as such while at MSC. (Bessler Aff., Ex. 1 at 55-60.) Mr. Thompson admitted, however, that things have changed since March 2000, when Mr. Cattoor left MSC. For example, Mr. Thompson testified that Fox entered into a deal with the Minnesota Wild. (Id. at 106.) As a result of that deal, the cost basis and revenue basis Cattoor may have had while at MSC is different than what it is today. (Id. at

106-107.) Information that is obsolete loses its economic value and is not protected as a trade secret. Lexis-Nexis, 41 F. Supp. 2d at 959.

Fox also suggests that Cattoor had access to the identity of cable operators. When asked whether the identity of cable operators was a trade secret, Mr. Fawcett answered "Not necessarily, but -." (Fawcett Dep. at 119). Mr. Fawcett explained that "there was a finite number of cable operators out there," and that "there are specific contacts within those organizations...." (Fawcett Dep. at 119.) Mr. Fawcett concluded that the contacts at the cable operators were "somewhat" a trade secret because "only entities that are in our business deal with specific people at those cable operators." (Id. at 120.)

Yet, "[g]eneral knowledge within an industry does not constitute trade secrets." Int'l Bus. Mach. Corp., 941 F. Supp. at 100; see Lexis-Nexis, 41 F. Supp. 2d at 959 (explaining that information that is readily ascertainable is not protected as a trade secret.) While customer contacts may constitute trade secret in some circumstances, information about customers, including knowledge of contact persons, do not constitute trade secrets where, as in this circumstance, that information is readily ascertainable within the industry. See, e.g., Lasermaster Corp. v.

Sentinel Imaging, 931 F. Supp. 628, 637 (D. Minn. 1996)(discussing and applying the jurisprudence of Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 511 (N.D. Ill. 1985)).

Fox also alleges that MSC's contracts with the University of Minnesota, the Minnesota Timberwolves and the Milwaukee Bucks are trade secrets. (See Hanson Aff., Ex. 4, University of Minnesota; Hanson Aff., Ex. 5, CBS Broadcasting Inc. License Agreement, Minnesota Timberwolves; Hanson Aff. Ex. 6, Cable Television Rights Agreement, Milwaukee Bucks.) Even though Cattoor treated the contracts as confidential while at MSC, MSC's failure to mark the relevant contracts "confidential" allowed the other parties to the contracts to freely disclose the contracts' terms. That failure undermines Fox's claim for trade secret protection because it illustrates that Fox did not exercise reasonable efforts at maintaining the document's confidentiality. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 901 (Minn. 1983)(concluding that reasonable measures to maintain secrecy not taken because none of company's relevant documents were noted "confidential."); United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628 (Minn. 1982)(finding no trade secret even though corporation classified information as confidential where corporation failed to make reasonable efforts to maintain secrecy of information.)

Fox specifically alleges that an out clause in the Gopher's Telecast Agreement constitutes a trade secret. (Mem. Law Opp'n.

Def.'s Mot. Summ. J. on Counts IV-VII at 20-21, n.77.) However, the out clause was part of a University of Minnesota contract, which is available to public under the Minnesota Data Practices Act ("DPA").[2] While Fox does not dispute the Twins' argument that the DPA applies, Fox asserts that Cattoor nonetheless can misappropriate the information. (Id.) However, information that is publically available cannot be a trade secret. Lasermaster Corp., 931 F. Supp. at 637-38. Thus, the University of Minnesota contract cannot receive trade secret protection.

Fox further alleges that Cattoor prepared a worksheet in August 2000 that discussed trade secret information. However, as Cattoor's supplemental affidavit clearly establishes, the information contained in the report was not confidential. (Cattoor Supp. Aff. ¶ 14.) Cattoor explicitly states: "None of the figures I used for this profit and loss statement was confidential information from MSC. It was either information from the teams themselves, public sources, or estimates based on my own general knowledge of the industry." (Id.) No contrary evidence

---

[2] The University of Minnesota is a public institution and is specifically named in DPA as subject to requests for disclosure of information. See Minn. Stat. § 13.02 Subd. 17 (defining state agency to include the University of Minnesota). The DPA "establishes a presumption that government data are public and are accessible by the public for both inspection and copying unless there is federal law, a state statute, or a temporary classification of data that provides that certain data are not public." Minn. Stat. § 13.03 Subd. 2. The court concludes that the DPA applies to the University of Minnesota contract with Fox.

establishes a question of fact as to whether the data used in the spreadsheet contains trade secret information. Thus, Fox's claim of trade secret misappropriation fails because Fox evinces no facts supporting the existence of a trade secret.

**2. Misappropriation**

Since no trade secrets exists to be misappropriated, the court technically need not reach the issue of whether misappropriation occurred. However, the court notes that even if Fox had presented sufficient evidence of trade secrets, which the court finds that Fox has not, Fox offers no evidence that Cattoor used or disclosed the trade secret information. Josten's, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691, 702 (Minn. 1982)("A misappropriation claim also requires proof ... that the defendants disclosed or used the trade secret.") The record unambiguously indicates the contrary.

Mr. Woelfel testified:

Q: Do you have any evidence as you sit there that Mr. Cattoor has made any improper use of either trade secrets or confidential information that he acquired at Fox or MSC with the Twins?

A: I do not have any direct knowledge. I have heard from individuals that Kevin has talked to cable affiliates. I have heard that Kevin has talked to some sports teams that we have represented.

Q: In connection with any of that information, have you been told that he has revealed anything that you or Fox considers a trade secret in any conversations, either internally at the Twins or with others?...

A: No, I do not believe he has revealed anything to them.

(Hanson Aff., Ex. 11, Woelfel Dep. at 96)(emphasis added); see also id. at 129-130 ("Q:[Y]ou don't know as you sit [h]ere today any specific instances where any confidential information has been disclosed to anybody by him? ... A. I do not have any knowledge of that.").)

In his deposition, Mr. Thompson also provided little evidence of misappropriation:

Q: Do you believe that Kevin Cattoor and the Twins have successfully utilized the information that you believe Mr. Cattoor took from MSC?

A: I wouldn't be in a position to know that yet. That's something only a passage of time will tell.

(Hanson Aff., Ex. 10, Thompson Dep. at 116 (emphasis added).)

Mr. Fawcett similarly testified:

Q: And what information within those contracts do you believe he [Mr. Cattoor] has misused?

A: I don't know specifically; back-end rights, expiration dates, financial terms, but I have no actual knowledge.

Q: Okay. And other than the fact that you believe he has met with representatives of these entities, what information or knowledge or basis for belief is there that he has issued these terms of the various contracts?

A. I just believe that it's inevitable that he'll use them.

(Hanson Aff., Ex. 9, Fawcett Dep. at 126). The evidence from deposition testimony clearly shows no actual disclosure of trade

secrets.[3] See Int'l Bus. Mach., Inc., 941 F. Supp. at 101 (denying preliminary injunction because, in part, party failed to prove that employee had actually disclosed any confidential information or trade secrets.) Thus, the court grants the Twins' motion for summary judgment on Fox's misappropriation of trade secrets claim because Fox presents insufficient evidence of misappropriation of trade secret information.

**B. Breach of Duty of Common Law and Fiduciary Duties (Cattoor)**

Fox asserts that Cattoor actively solicited sports teams and cable providers with whom Fox had current contracts and/or business relationships. Fox claims that Cattoor therefore "breached his

---

[3] As part of its claim, Fox nevertheless alleges that an email from Cattoor received provides evidence that Cattoor was misusing MSC's confidential and proprietary information. In an email about regional sports network subscriber fees, Cattoor is asked: "Kevin, How did you originally come up with the MSC sub free pricing model? Was the avg fee driven by the cost to run the network or was it driven by the cost of similar programming (ie ESPN)? Cr a combination of both?" (Cattoor Supp. Aff., Ex. 2.) The email, however, offers no evidence of Cattoor's misappropriation of trade secrets because the email shows nothing about Cattoor's answer. The facts unambiguously establish that Cattoor did not discuss MSC's pricing or other confidential information in his answer to the email. (Cattoor Supp. Aff. ¶¶ 6, 15.)

Further, contrary to Fox's assertions, the doctrine of inevitable disclosure does not protect Fox's misappropriation claim from summary judgment. In Int'l Bus. Mach., 941 F. Supp. at 101, the court required a showing of "a high degree of probability of inevitable disclosure." Id. (quoting Surgidev Corp. v. Eye Tech., Inc. 648 F. Supp. 661, 695 (D. Minn. 1986). Here, no facts suggest that Cattoor holds Fox's trade secret information has misappropriated trade secret information. The court therefore concludes that it highly unlikely that he will misappropriate the information in the future.

common law duty not to disclose or use confidential information gained at the expense of his employer." (Mem. Law Opp'n Def.'s Mot. Summ. J. on Counts IV-VII at 27 (quoting Saliterman v. Finney, 361 N.W.2d 175, 179 (Minn. Ct. App. 1985).) However, Fox's claim is based upon its trade secret claim, (Compl. ¶ 72.), and as discussed, Fox offers no evidence that Cattoor ever misused any confidential information that came from MSC. Thus, for the same reasons that Fox's misappropriation of trade secrets claim fails, Fox's breach of fiduciary duty claim also fails. The court therefore grants the Twins' motion for summary judgment on that issue.

**C. Tortious Interference with Contract (Twins and Cattoor)**

Fox asserts that the Twins tortiously interfered with Fox's contracts with the Timberwolves, the University of Minnesota and the Milwaukee Bucks. In its motion papers, Fox focuses only on Fox's contracts with the Timberwolves and University of Minnesota, impliedly conceding that no evidence exists to support the claim with respect to the Milwaukee Bucks contract. Fox, however, also fails to offer evidence to support its contention that the Twins tortiously interfered with Fox's contracts with the Timberwolves and the University of Minnesota.

The elements of tortious interference with a contract are (1) the existence of a contract, (2) the wrongdoer must have knowledge of that contract, (3) the wrongdoer must intentionally

procure the breach, (4) there must be no justification and (5) there must be resulting damages. Lipka v. Minnesota School Employees Ass'n, Local 1980, 537 N.W.2d 624, 631 (Minn. Ct. App. 1995).

No evidence indicates that the Twins' communications with the University of Minnesota constitute tortious interference. While the University of Minnesota had a contract with Fox that provided that the University could terminate the contract in 2002, Fox offers no evidence that the Twins urged the University to exercise its termination rights.

Likewise, no evidence suggests that the Twins' communications with the Timberwolves constitute tortious interference. While the Twins and the Timberwolves did explore the formation of an RSN, Fox fails to prove how the exploration process tortiously interferred with Fox's contract with the Timberwolves. Fox notes that its contract with the Timberwolves contains a clause that provides that "MSC will have the first right of negotiation for a new Pay TV telecast agreement from January 1, 2001 through April 1, 2002 (the 'Negotiation Period')." (Hanson Aff., Ex. 5.) Under this provision, "[t]he Timberwolves agree not to solicit or accept any offers for rights granted herein until the right of first negotiation period has expired." (Id.) Fox, however, offers no evidence that the Twins procured the Timberwolves to breach that clause. Instead, the evidence indicates that the Timberwolves did

not solicit or accept any offers for a broadcast agreement during the negotiation period, (Cattoor Aff., ¶ 14) and that the discussions between the Timberwolves and Twins during the negotiation period did not involve offers or negotiations for broadcast rights. (Id. ¶¶ 13-14.) The court therefore grants the Twins' motion for summary judgment on Fox's claim of tortious interference with contract.[4]

**III. Twins' Counterclaims**

The Twins allege the following six counterclaims against Fox: Count I, declaratory judgment; Count II, Business Defamation; Count III, Defamation; Count IV, Unfair Competition; Count V, Tortious Interference with Prospective Business Relations and Count VI, Breach of Contract. (Answer and Counterclaims at 20-21.) Fox now moves for summary judgment on Counts II, III, IV and V of the Twins' counterclaims. The court examines each of those counterclaims in turn.

**A. Defamation and Business Defamation**

The Twins assert a counterclaim for business defamation, Counterclaim I, and defamation, Counterclaim II, alleging:

---

[4] The Twins submitted a detailed memorandum discussing why the court should grant its motion for summary judgment on Fox's claim of tortious interference with prospective business relations. Fox failed to respond to that claim, essentially conceding that its claim could not survive summary judgment. The court therefore also grants the Twins' motion for summary judgment on Fox's claim of tortious interference with prospective business relations.

> ... Fox circulated to the Twin Cities' media statements regarding the Minnesota Twins. In these statements, Fox has made materially false and defamatory statements regarding the Minnesota Twins and Mr. Cattoor. Specifically Fox has falsely accused the Minnesota Twins and Mr. Cattoor of "attempting to undermine the rights we [Fox] have acquired, as well as sour our [Fox's] other local relationships.... [The Minnesota Twins either] plan an immediate relocation of the team outside the Twin Cities area or they are trying to walk away from rights that we [Fox] have already bought and paid for. Additionally, we believe that the team, with the improper assistance of Mr. Cattoor, has been plotting to start a competing network, and thus has been trying to interfere with our other local contractual arrangements in order to increase their own future financial gain.

(Countercl. at 18, ¶ 4.) Fox denies that those statements are defamatory.

In Minnesota, the elements of a common law defamation are well settled. McClure v. Am. Family Mut. Ins. Co., 29 F. Supp. 2d 1046, 1054 (D. Minn. 1998). In order for a statement to be actionable, the plaintiff must "'prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community.'" Id. (quoting Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 25 (Minn. 1996). Because the first element of plaintiff's prima facie case - the falsity of the statement - is the key issue in dispute, the court focuses its analysis on that element.

With regard to the falsity element, the First Amendment provides a limited protection to defamation defendants. While "[u]nder the First Amendment there is no such thing as a false idea[,]... there is no constitutional value in false statements of fact." Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974). In evaluating the scope of the First Amendment protection, the Supreme Court has rejected the "artificial dichotomy between 'opinion' and fact." Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990). As the Court observed in Milkovich, "expressions of 'opinion' may often imply an assertion of objective fact." Id. at 18.

Whether a statement is opinion or fact is a question of law and an appropriate subject for summary judgment. Secrist v. Harkin, 874 F.2d 1244, 1250 (8th Cir. 1989); Stepien v. Franklin, 528 N.E.2d 1324, 1329 (Ohio Ct. App. 1988). To distinguish between protected expressions of idea and actionable assertions of fact, Minnesota courts rely on the framework developed in Janklow v. Newsweek, Inc. 788 F.2d 1300 (8th Cir. 1986). See McClure, 29 F. Supp. 2d at 1054; Hunt v. University of Minnesota, 465 N.W.2d 88, 93-94 (Minn. Ct. App. 1991); Lund v. Chicago & Northwestern Transp. Co., 467 N.W.2d 366, 369 (Minn. Ct. App. 1991). Under Janklow, courts evaluate whether a statement has defamatory meaning using four factors: (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary

context in which the statement is made and (4) the statement's public context. Janklow, 788 F.2d at 1302-1303. "No single factor is dispositive." Capan v. Daugherty, 402 N.W.2d 561, 564 (D. Minn. 1987). These factors are "considered together" and "the decision whether a statement is fact or opinion must be based on all the circumstances involved." Janklow, 788 F.2d at 1302.

The first Janklow factor, precision and specificity, addresses how susceptible a statement is to being understood as a factual assertion. "It is difficult to call a vague or imprecise statement a fact." Id. at 1302.

The second factor, verifiability, goes directly to whether a statement is considered a fact. McClure, 29 F. Supp. 2d at 1055. Statements may be phrased so that is it hard to establish a provable proposition, or the subject matter of the statement "may intrinsically be unsuited to any sort of quantification." Janklow, 788 F.2d at 1302. In addressing the issue of ambiguous subject matter, Minnesota courts have employed the doctrine of "substantial truth." See Hunter v. Hartman, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996); Anjoorian v. Minneapolis Dep't of Public Safety, 1997 WL 527233 (Minn. Ct. App. Aug. 26, 1997)(unpublished). Under this doctrine,

> A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a

> successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances.

Hunter, 545 N.W.2d at 707; see also Jadwin v. Minneapolis Star & Tribune Co., 390 N.W.2d 437, 441 (Minn. Ct. App. 1986)("If the statement is true in substance, inaccuracies of expression or detail are immaterial... 'A statement is substantially accurate if its gist or sting is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.'"(citations omitted).)

However, the U.S. Supreme Court has distinguished statements that are inherently unverifiable from statements that merely advertise themselves as opinions. There is a significant difference, the Court stated in Milkovich, between the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," which would not be actionable, and the statement, "In my opinion, Mayor Jones is a liar," which would be actionable. 497 U.S. at 19. The court explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated:

> "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"

Id. at 18-19.

The Court continued:

> We note that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as a basis for a defamation action .... Id. at 20 n.7.

The doctrine of substantial truth, therefore, does not apply to a specific, unambiguous statement, even if it is phrased as an opinion. Stokes v. CBS, Inc., 25 F. Supp. 2d 992, 998 (D. Minn. 1998). Rather, "the court must look to the nature and obvious meaning of the language in its plain and ordinary sense, construing it as a whole, including innuendos reasonably laid from the statement." Phipps v. Clark Oil & Refining Corp., 396 N.W.2d 588, 594 (Minn. Ct. App. 1986). The test for "substantial truth" is broad: if any reasonable person could find the statements to be "supportable interpretations" of their subjects, the statements are incapable of carrying a defamatory meaning, even if a reasonable jury could find that the statements were misrepresentations. Hunter, 545 N.W.2d at 707.

The third Janklow factor addresses the social and literary context of a disputed statement. McClure, 29 F. Supp. 2d at 1054. The publisher of a statement will often use cautionary language to diminish or negate the overall defamatory effect. See Janklow, 788 F.2d at 1302. Further, the "category of publication, its style of writing and intended audience" may influence how a statement is understood. Id. at 1303; see also Jadwin, 390 N.W.2d at 443 ("The defamatory character of any particular statement must be construed in the context of the article as a whole"). For instance, the Eighth Circuit has found that the literary context of a press release supports a finding that the challenged statements are opinion, rather than fact. Secrist, 874 F.2d at 1249 (finding the press release in that case to signal political opinion as a newspaper editorial or political cartoon.).

The fourth and final Janklow factor considers the broader public context in which a statement is made. "[W]hen determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment." Janklow, 788 F.2d at 1303.

Using the Janklow factors, the court now turns to its analysis of the disputed press release. First, the statements in the press release are imprecise and lack specificity. See McClure, 29 F.

Supp. 2d at 1056 (finding statements in the press release to be imprecise and lack specificity). For instance, Fox's press release alleges that the Twins are attempting to "sour [Fox's] other local relationships" and have been "plotting to start a competing network and thus interfere with [Fox's] other local contractual arrangements." (Bessler Aff., Ex. 11.) Words such as "sour," "plotting" and "interfering" are imprecise words that lack specificity and cannot be interpreted as stating facts. See Schibursky v. Int'l Bus. Mach. Corp., 820 F. Supp. 1169, 1181-82 (D. Minn. 1993)("Even assuming that the defendants communicated to others that Schibursky was 'hard to work with' or 'rude,' the statements... are too imprecise to be actionable."); McGrath v. TCF Bank Sav., FSB, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993)(finding "troublemaker" to be imprecise and thus not actionable under constitutional or common law standards of defamation); Lee v. Metro. Airport Comm'n, 428 N.W.2d 815, 821 (Minn. Ct. App. 1988)("...statements that appellant is a 'fluffy,' a 'bitch,' or flirtatious are too imprecise in nature to be actionable defamatory statements.").

In analyzing the second factor - verifiability - the court finds that substantial truth doctrine defeats the Twins' defamation counterclaim because the press release "advocates one of several feasible interpretations" of the legal dispute between Fox and the

Twins. The press release simply delineates Fox's interpretation of the present litigation. For instance, it provides:

> Despite a lease entitling the Twins to play at the Metrodome through these next two seasons, Mr. Cattoor has told Fox that the Twins do not have an acceptable local stadium in which to host their home games starting next season, and thus wishes to terminate our telecast rights agreement. This position can only be interpreted to mean that either the Twins plan an immediate relocation of the team outside of the Twin Cities area, or they are trying to walk away from rights that we have already bought and paid for.

(Bessler Aff., Ex. 11.)[5]

Contrary to the Twins' assertion, the press release does not ignore an alternative third interpretation of the Twins position, namely that there is no acceptable stadium solution. The press release explicitly sets out that interpretation, stating that "Mr. Cattoor has told Fox that the Twins do not have an acceptable local stadium...." (Bessler Aff., Ex. 11 (emphasis added).) Thus, the

---

[5] Fox explicitly sets out it's legal opinion throughout the release. In another paragraph, the press release continues:

> Our intention is that the Court make clear what we and the local community have already been led to believe - that the Twins have no intention of moving the team, and would expect to remain a local fixture at the Metrodome, at least for the 2002 and 2003 seasons. If that's true, then the Twins and Mr. Cattoor must honor our contractual rights, and stop any interference with the standing agreements that we're fortunate to enjoy with other teams. We are confident that the Court, as well as the people of Minnesota, will agree.

(Bessler Aff., Ex. 11.)

"substantial truth doctrine," indicates that Fox's press release is not defamatory. Hunter, 545 N.W.2d at 707.

Third, the literary context in which the statement was made suggests that it was a statement of opinion, rather than fact. As discussed, according to the Eighth Circuit, the literary context of a press release supports a finding that the challenged statements are opinion. Secrist, 874 F.2d at 1249 (finding the press release in that case to signal political opinion as a newspaper editorial or political cartoon.). Here, Fox was relaying its legal opinion in a press release. While the Twins emphasize that Fox did not distribute its statement in the context of an editorial or letter to the editor, "[t]he fact that the [statement] did not appear in the opinion-editorial page, while relevant, is not dispositive...." Capan v. Daugherty, 402 N.W.2d 561, 564 (Minn. Ct. App. 1987).

Additionally, the writing style of the release is opinion-oriented. See Secrist, 874 F.2d at 1250. The fact that the press release states that Fox has "interpreted" the Twins' position shows that Fox is offering its legal opinion on the Twins' position, rather than offering a statement of fact. The release also uses cautionary language such as "we believe" and "[i]f that's true" to indicate that Fox is offering an opinion. See Janklow, 788 F.2d at 1302. Further, an adversarial tone was clear in the release. See Capan, 402 N.W.2d at 564 (in finding statement to be opinion, court noted that an adversarial tone was clear). Thus, from the literary

context, reasonable people would understand that the press release represents Fox's legal opinion about the pending litigation. See, e.g., Seidl v. Greentree Mortgage Co., 30 F. Supp. 2d 1296, 1316-17 (D. Colo. 1998)(finding attorney's demand letter to be a statement of client's legal position, or opinion, and thus not defamatory, despite its inflammatory language.)

The fourth factor, the public context, does not tip the balance toward the Twins. "In a case involving private parties and private concerns, a state's interest in providing a remedy for defamation can outweigh constitutional concerns." McGrath, 502 N.W.2d at 808 n.4. However, "when statements 'are clearly opinions, the state's interest fades and the first amendment predominates.'" Id. Here, unlike Janklow, 788 F.2d at 1300 (stating, in case involving former state attorney general, that "speech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment), or Secrist, 874 F.2d at 1249 (involving political controversy in Senate campaign), the allegedly defamatory press release does not involve public officials or the political arena and thus does not implicate the core First Amendment principles to the extent that those values were implicated in Janklow and Secrist. Nevertheless, because the press release offers Fox's opinion, the First Amendment's protections dominate.

In sum, because the Janklow analysis indicates that alleged defamatory statement are imprecise, unverifiable, presented in a press release, and opinion-oriented, the court finds that the challenged statements from Fox's press release constitutionally protected under the First Amendment. The court therefore grants Fox's motion for summary judgment on the Twins' counterclaim for business defamation and defamation.

**B. Counterclaim of Tortious Interference with Prospective Business Relationships**

The Twins allege that "[b]y intentionally, falsely, and publicly disparaging Defendants' business character, Fox has interfered with Defendants' prospective business relations with other sports teams and cable operators." (Countercl. ¶ 20.) The Twins point to letters sent by Fox's counsel, Barbara Berens, to third parties as evidence of improper conduct, including a May 31, 2001 letter to the Timberwolves' president Rob Moor.[6] (Def.'s Mem. Opp'n Summ. J. Countercl. at 9.) The Twins also point to Fox employees' admission of discussions with Moor as evidence of improper conduct.[7] (Id. at 9.)

---

[6] As evidence of interference, the Twins point to Robert Thompson's testimony that Moor "basically said that because of the lawsuit, his preference was to wait and see how that played out, and in effect, that our attorneys had scared him with a letter," as well as Cattoor's testimony that it has been difficult to negotiate agreements because of the lawsuit. (Def.'s Mem. Opp'n Summ. J. Countercl. at 9.)

[7] In its motion papers, Fox argues that the press release, (continued...)

Although the Twins claim interference generally with a number of third parties, the expert report on damages only estimated losses as a result of Fox's alleged interference with the Timberwolves and the University.[8] (Hanson Aff., Ex. 16 at 8-9.) The Twins point to nothing in the record to illustrate that alleged interference from Fox caused the University not to develop business relations with the Twins. See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632 (Minn. 1982)("In an action for tortious interference with contractual relations, the plaintiff carries the burden of proving that interference was caused by the defendant."). The court's analysis therefore only addresses Fox's alleged interference with the Timberwolves.

Minnesota has adopted the Restatement (Second) of Torts § 766(b) (1979) definition of tortious interference with prospective contractual relations. See United Wild Rice, 313 N.W. 2d at 632-633.

---

[7](...continued)
discussed above, does not constitute tortious interference with prospective business relations. The Twins do not dispute that contention. The Twins do not even refer to the press release in its discussion of tortious interference with prospective business relations. Instead, the Twins only refer to Fox's contacts with third parties. Thus the court does not address the press release, but notes in dicta that the press release would not constitute tortious interference with prospective business relationships.

[8] As evidence of damages, the Twins point to Donald Nicholson's expert report estimating damages in the range of $13.1 to $14.7 million because of alleged interference with prospective relations with the Timberwolves and the Twins. (See Hanson Aff., Ex. 16 at 8-9.)

> One who intentionally and improperly interferes with another's prospective contractual relations...is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Id. (citing Restatement (Second) of Torts § 766B (1979). See Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1505 (8th Cir. 1992) (applying Minnesota law); Kellar v. VonHoltum, 568 N.W.2d 186, 190 (Minn. Ct. App. 1997); R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 570-571 (Minn. Ct. App. 1996). "The law clearly requires the actor's conduct to be improper before liability for interference with prospective contractual relations will attach." Anheuser-Busch, 556 N.W.2d at 571. Making representations to third parties is not improper if the representations are true. See Glass Serv. Co., Inc. v. State Farm Mut. Auto. Ins., 530 N.W.2d 867, 871 (Minn. Ct. App. 1995). There is "no liability for interference on part of one who merely gives truthful information to another." Id. (citing Restatement (Second) of Torts § 722 cmt. b (1979).)

The letter from Fox's counsel to the Timberwolves' president Moor informed the Timberwolves that "improperly" affecting Fox's contractual rights would be considered interference with Fox's

contractual relations.[9] (Hanson Aff., Ex. 15.) Moor told Thompson that Fox's counsel's letter "scared" him.[10] (See Thompson Dep. at 62.) Because "improperly" affecting Fox's contractual rights would constitute interference with Fox's contractual rights, the representations in the letter are true. Therefore, the letter is not improper conduct by Fox and cannot constitute a basis for tortious interference with the Twins' prospective business relationships. See Glass Serv. Co., 530 N.W.2d at 871 ("State Farm's representations to its insureds of potential liability for repair costs if Glass Service was used were not improper because they were not false."). Thus, the Twins' counterclaim fails and the court grants Fox's motion for summary judgment on the claim.

**C. Unfair Competition**

The Twins argue that the court should deny Fox's motion for summary judgment on the Twins' counterclaim for unfair competition

---

[9] The letter to Moor concludes with:

> This letter will also serve as notice that discussions between the Twins and the Timberwolves that improperly affect Fox's contractual rights with either the Twins or the Timberwolves, or Fox's contracts and/or arrangements with cable operators, advertisers, and other sports teams will be considered to be interference with Fox's contractual rights.

(Hanson Aff., Ex. 15.)

[10] Because Moor made no reference to his conversation with Schell as being a factor that scared him, the court finds that the conversation is not a basis for the tortious interference counterclaim and therefore will not address that conversation.

based upon the same reasoning the Twins' offer to defend the counterclaim for tortious interference. (Def.'s Mem. Opp'n P.'s Mot. Summ. J. at 22.) However, for the same reason that the Twins' Counterclaims II, III and V fail, the Twins Counterclaim IV, unfair competition, also fails.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment on defendants' counterclaims II-V [Docket No. 51] is granted and defendants' counterclaims II-V are dismissed with prejudice.

2. Defendants' motion for summary judgement on plaintiff's claims III-VII [Docket No. 24] is granted and plaintiff's claims III-VII are dismissed with prejudice.

Dated: July 9, 2002

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

David S. Doty, Judge
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

***June 1, 2000***

Forms/8thcircuitprehearingconf.wpd